# SUPREME COURT OF THE UNITED STATES

## JAMES DALE HOLCOMBE *v.* FLORIDA

ON PETITION FOR WRIT OF CERTIORARI TO THE DISTRICT
COURT OF APPEAL OF FLORIDA, FIFTH DISTRICT

No. 21–53.   Decided February 28, 2022

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, dissenting from the denial of certiorari.

An attorney jointly represented four codefendants in a criminal case.  As trial neared, two of the defendants accepted plea deals and agreed to testify against the other two: James Dale Holcombe, the petitioner here, and his father, Dale Chester Holcombe.[1]  This created a conflict of interest that even the prosecutor deemed nonwaivable.  Nevertheless, the trial court refused defense counsel's offer to withdraw from representing the cooperating codefendants and neglected to conduct a detailed inquiry into the nature and extent of the conflict.  The case went to trial, and Holcombe's attorney cross-examined his two cooperating clients, whose sentences depended on the quality of the testimony they provided against Holcombe.  Holcombe was convicted, and the Florida Court of Appeal affirmed.  Because this Court's precedents require vacating Holcombe's conviction, I would summarily reverse.

I

At the outset of his criminal prosecution, Holcombe, Dale, and their two codefendants were represented by the same counsel.  During a pretrial conference, defense counsel advised the trial court that he would be representing all four codefendants.  He explained that he had advised each of the

---

[1] For clarity, I refer to Dale Chester Holcombe by his given name and to the petitioner by his surname.

defendants to consult with an independent attorney about the joint representation; that the defendants had done so; and that they wished to waive any conflict and have their counsel continue representing them. The trial judge discussed some of the risks of joint representation with the defendants, expressing concern that they were in "dangerous territory" and "on super thin ice." App. to Brief in Opposition A–12. The attorney responded that "all these cases are probably going to resolve within a certain margin of error that we're prepared to accept as a group," and that he was "not aware of any particular conflict based on our current strategy." *Id.*, at A–16 to A–17. Counsel noted, however, "that if there becomes a conflict I will have to withdraw." *Id.*, at A–16. The court ultimately concluded that the arrangement was not illegal or unethical because the defendants had discussed it and signed a conflict waiver.

As trial approached, however, the nature of the conflict shifted. During another pretrial hearing, defense counsel informed the trial court that two of Holcombe's codefendants had entered pleas. Soon thereafter, the prosecution decided to call them as witnesses against Holcombe and Dale at trial. All four of the codefendants were still represented by the same counsel.

Before jury selection began, the prosecutor told the trial court that, in her opinion, "[t]he circumstances [had] changed" and that Holcombe's two codefendants' decisions to accept plea deals created a "greater conflict that . . . is not waiveable." App. to Pet. for Cert. A–34 to A–35. The prosecutor explained that, because the trial court had postponed the two codefendants' sentencing until after they testified against Holcombe and Dale, the sentences they received would depend on the quality of their testimony. See *id.*, at A–34 ("[I]t's in their best interest to cooperate and testify truthfully in order to benefit from the plea discussions"). Yet in order to represent Holcombe and Dale at trial, the defense attorney would be required to cross-

examine those other two codefendants—his "current clients," whose sentences would be determined based on how "cooperative" they were with the State. *Ibid.* In other words, the shared attorney's divided loyalties might result in a less-than-exhaustive cross-examination of the cooperating witnesses, to Holcombe's and Dale's detriment. Upon hearing the prosecutor's explanation, defense counsel offered to withdraw from representing the two codefendants and have conflict counsel appointed instead. Defense counsel proceeded to explain that he "d[id]n't know that [withdrawing would] cur[e]—," at which point the trial judge interrupted. App. to Brief in Opposition A–34.

Despite being made aware of this patent conflict, the trial judge did not question the remaining two defendants, encourage them to speak to an unconflicted attorney, or advise them that they had a right to separate representation. Instead, the court simply rejected defense counsel's offer to withdraw, concluding that any conflict had been properly waived earlier in the proceedings, before the two codefendants accepted the plea deals and began cooperating with the prosecution. The trial proceeded; Holcombe's two codefendants testified against him and Dale on behalf of the prosecution (and were cross-examined by their shared attorney); and Holcombe was convicted and sentenced to 10 years in prison.[2]

The Florida Court of Appeal affirmed. It concluded that an attorney's simultaneous representation of both a criminal defendant and two prosecution witnesses, and his cross-examination of those witnesses, does not, without more, create an actual conflict for the purpose of the Sixth Amendment. Because Holcombe had not shown any adverse effect on defense counsel's performance, the court held that reversal was unwarranted.

—————

[2] Dale was convicted as well. See Tr. 1147–1148.

## II

Although a joint representation of codefendants "is not *per se* violative of constitutional guarantees of effective assistance of counsel," this Court has recognized that a "[j]oint representation of conflicting interests is suspect" because "the advocate finds himself compelled to refrain" from vigorously defending his clients. *Holloway* v. *Arkansas*, 435 U. S. 475, 482, 489, 490 (1978) (emphasis deleted). Courts therefore bear a responsibility to investigate if they "kno[w] or reasonably should know that a particular conflict exists." *Cuyler* v. *Sullivan*, 446 U. S. 335, 347 (1980); accord, *Holloway*, 435 U. S., at 483 (explaining that a trial court has an "affirmative duty . . . to assure that criminal defendants are not deprived of their right to the effective assistance of counsel by joint representation of conflicting interests"). When a trial court is made aware of an actual conflict before trial and fails to inquire into the nature and scope of the conflict, reversal of a defendant's conviction is automatic. See *Mickens* v. *Taylor*, 535 U. S. 162, 167–168 (2002); *Holloway*, 435 U. S., at 488–490.

In this case, the trial court properly discharged its obligation at the outset of proceedings, but failed to fulfill its renewed obligation after an actual conflict arose. At the outset, the trial court was made aware of a "possible" or "potential" conflict—that is, one that had not fully materialized because the codefendants' interests could diverge but had not yet done so. See *Wheat* v. *United States*, 486 U. S. 153, 163 (1988) (noting that a "potential" conflict "may or may not burgeon into an actual conflict as the trial progresses"); *Sullivan*, 446 U. S., at 348 ("[A] possible conflict inheres in almost every instance of multiple representation . . . "). The trial court appropriately responded by inquiring into the codefendants' consent to the joint representation, expressing well-founded concern that they were in "dangerous territory," and approving the joint representation based on the codefendants' waivers and counsel's representation that

any conflict remained hypothetical. App. to Brief in Opposition A–12.

Once notified that the codefendants' interests had parted ways, however, the trial court was obligated to inquire further. That divergence of interests sharpened the potential conflict into an "actual" conflict—that is, one in which "the defendants' interests . . . diverge with respect to a material factual or legal issue or to a course of action." *Sullivan*, 446 U. S., at 356, n. 3 (Marshall, J., concurring in part and dissenting in part). Such a conflict actually "affect[s] counsel's performance," unlike "the mere theoretical division of loyalties" presented by a possible conflict. *Mickens*, 535 U. S., at 171 (emphasis deleted).

Here, the prosecutor unequivocally identified an actual conflict, different in kind from the potential conflict the trial court had previously considered, by explaining that Holcombe's codefendants' decisions to testify against him created an unwaivable conflict. Her concerns were well founded. The codefendants' pleas put defense counsel in an impossible dilemma: If the attorney successfully undermined the codefendants' testimony, he would aid Holcombe's defense, but potentially jeopardize the codefendants' ability to obtain lenient sentences. Holding back against the codefendants, on the other hand, would improve their chances at sentencing, but allow the State's key witnesses to provide damning evidence against Holcombe. Once notified of this conflict, the trial court had an obligation to inquire further into its nature and extent. At minimum, given that the potential conflict had matured into an actual conflict, the court should have taken the precaution of advising the defendants to confer again with unconflicted counsel regarding the propriety of the representation and should have directly explained the serious dangers of continuing with an actually conflicted attorney. Because it did not, reversal of Holcombe's conviction on appeal should have been automatic. See *Sullivan*, 446 U. S., at 350; see

also *Holloway*, 435 U. S., at 488.

The Florida Court of Appeal erred by concluding that Holcombe bore the additional burden of proving an adverse effect on his representation. The court relied on *Mickens*, but that case declined to apply *Holloway*'s "automatic reversal rule," *Mickens*, 535 U. S., at 168, for two reasons not present here. First, the Court in *Mickens* distinguished *Holloway* on the ground that defense counsel failed to object to "his inability simultaneously to represent multiple defendants" before the trial court. *Mickens*, 535 U. S., at 173. Second, *Mickens* concerned only a potential conflict of interest resulting from successive representations, rather than the type of joint (concurrent) representation addressed in *Holloway* or the actual conflict identified here. See *Mickens*, 535 U. S., at 175 (distinguishing "the high probability of prejudice arising from multiple concurrent representation" from other attorney conflicts, including "prior representation").

Unlike *Mickens*, this case concerns an actual conflict created by a simultaneous joint representation that was timely brought to the trial court's attention. That it happened to be the prosecutor who first raised the conflict does not affect whether *Holloway*'s automatic reversal rule applies. This Court's precedents hold that the duty to inquire is a duty of the trial court—not of any particular party. *Sullivan*, 446 U. S., at 347; *Mickens*, 535 U. S., at 168–169; *Holloway*, 435 U. S., at 483. Consistent with this principle, the key question is whether the trial court was alerted to the conflict, not by whom. See, *e.g.*, *Wood* v. *Georgia*, 450 U. S. 261, 272–273 (1981) ("Any doubt as to whether the court should have been aware of the [conflict] is dispelled by the fact that the State raised the conflict . . . explicitly and requested that the court look into it"); see also *Mickens*, 535 U. S., at 168 (where "[n]either counsel nor anyone else objected to the multiple representation," *Holloway*'s rule did not apply); *Sullivan*, 446 U. S., at 347 (where "[n]o participant in

[the defendant's] trial ever objected to the multiple representation," the Sixth Amendment did not obligate the trial court to inquire). A contrary rule would offer less protection to those defendants whose counsel is so severely conflicted that even the prosecution is compelled to voice its concern.

Decades ago, this Court explained that "[t]he mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." *Holloway*, 435 U. S., at 490. The proceedings below failed to protect that core constitutional guarantee. For these reasons, I would summarily reverse the judgment of the Florida Court of Appeal.