Timothy G. Lahey, District Judge,
assigned, dissenting: I respectfully dissent. Anytime a lawyer represents a defendant and has a current or prior attorney client relationship with a witness in the case, a potential conflict exists. In every such case, the attorney faces the theoretical obstacles set forth in the majority opinion. Yet, Mickens v. Taylor, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291, reh. denied 535 U.S. 1074 (2002), and State v. Galaviz, 296 Kan. 168, 291 P.3d 62 (2012), clearly show that despite the existence of conflicting loyalties, not every conflict results in an automatic reversal.
While Aaron Gipson was representing Deshawn Jackson, he was appointed to represent Francisco Beltran in a separate probation violation proceeding in an earlier case in which Beltran and Jackson were apparent accomplices. Beltran was an endorsed witness in this case against Jackson, hence the conflict. I agree with the majority that defense attorney Gipson concurrently represented Beltran and Jackson, that he did not obtain a written waiver of the conflict, and that he did not advise the court of the conflict. I disagree with the majority’s analysis and conclusion that Jackson is entitled to a new trial on the basis of the conflict.
In the hearing before the district court, Jackson testified that Gipson never told him about his representation of Beltran. The district court heard evidence and rejected Jackson’s claim. The *145 court found that Gipson did disclose and discuss his representation of Beltran with. Jackson. According to Gipson, when told of the conflict, Jackson said it was okay—Beltran was not really a witness to anything, and it was not an issue. More than 2 years later, Jackson is asking the court to set aside Iris plea because of a conflict he knew about all along.
The majority’s criticism of Gipsons failure to obtain a written waiver and failure to advise the trial court of the conflict may well be justified under the Rules of Professional Conduct (KRPC). However, the KRPC are “not designed or intended to provide substantive or procedural law for criminal proceedings in district court.” State v. Stovall, 298 Kan. 362, 372, 312 P.3d 1271 (2013). Gipson’s failure to follow the KRPC by obtaining a written waiver of the conflict merely confirms the existence of the conflict. Gip-son’s failure to advise the court of the conflict does not change the test to be applied when evaluating the conflict—the attorney in Mickens also failed to advise the court of the conflict.
As explained by Justice Luckert, under Mickens, a defendant is not entitled to automatic reversal based on the defense attorneys conflict of interest if there was no timely objection to tire attorneys representation. State v. Galaviz, 296 Kan. at 170. Here, Jackson knew of the conflict and raised no objection. When a defendant knows of a conflict and does not object, the defendant bears the burden of showing that the conflict actually adversely affected the adequacy of the lawyer’s representation. The defendant is, however, not required to show prejudice as required in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied 467 U.S. 1267 (1984). Prejudice is presumed if the defendant shows the conflict significantly affected counsel’s performance. Mickens, 535 U.S. at 172-73. Within the Mickens framework as explained in Galaviz, Jackson must do more than point to the conflict—he must establish that the conflict of interest had an adverse effect on his attorney’s representation of him. This actual conflict of interest requirement means more than a mere division of loyalties; it requires a conflict that actually, not theoretically, affected counsel’s performance. See Mickens, 535 U.S. at 171.
*146 When challenging the performance of counsel, a defendant must do more than allege the potential for conflict, he must point to specific instances to support his contention. United States v. Alvarez, 137 F.3d 1249, 1252 (10th Cir. 1998). Jackson must come forward with evidence which shows the representation was significantly affected. See Mickens, 535 U.S. at 172-73.
What did Gipson do that was disadvantageous to his client? We know Jackson claimed that Gipson coerced the plea by threatening Jackson that he would receive the maximum sentence if he did not take the plea deal. But the trial court specifically rejected that contention. Beyond that specific allegation, Jackson’s testimony at the motion to withdraw plea sheds no fight on just what Gipson did or did not do that adversely affected the representation. When asked how Gipson’s representation was deficient, Jackson said Gip-son “knew Beltran was a witness on my case for the State, so he should have known to withdraw from my case or from Beltran’s, one of the two.”
The successful argument made by Jackson and accepted by the majority is that Gipson’s “mindset” was affected when he was negotiating and explaining the plea deal. No evidence was presented describing what Gipson said or did when negotiating and explaining the plea deal that had an adverse effect on the representation. The majority cites no evidence or specific facts, beyond the existence of “divided loyalties” as the basis for reversing the trial court. Jackson has the burden of showing specific instances to support his contentions of an actual conflict of interest adverse to his interests and not merely a theoretical division of loyalties. See Mickens, 535 U.S. 171-73.
The majority summarized the “actual adverse affect” on the representation as follows:
“To avoid drawing attention to this obvious conflict of interest, Gipson had an incentive to make sure Jackson pleaded guilty in this case. Indeed, Beltran was scheduled to testify against Jackson if this case went to trial. Moreover, if the State called Beltran as a witness, Gipson would have been required to impeach Beltran’s credibility, possibly using Beltran’s former criminal record. This would have created a situation of‘divided loyalties’ in Gipson’s representation of Jackson and Beltran. Thus, Gipson’s continued representation of both Jackson and Beltran clearly depended on Jackson accepting a plea deal with the State.” Slip op. at 22.
*147 The district court made no finding that Gipson was motivated by a desire to avoid drawing attention to the conflict. To the contrary, the court found that Gipson actually drew attention to the conflict— he told Jackson about it, and Jackson had no objection to the dual representation. Jackson recognized that Beltran was not a witness to anything. Jacksons own testimony and the circumstances of the crime as disclosed in the record refute the other concerns expressed by the majority about the significance of Beltran as a possible witness.
The evidence in the record shows that the only witnesses to the actual events underlying the attempted murder, as well as the other crimes, were Jackson, the victim, and their 1-year-old daughter. Those events occurred at the victim’s residence. Beltran was never at the victim s residence.
At the preliminary hearing, a police investigator testified that Jackson, after Miranda, admitted tying up the victim and putting tape over her mouth; forcing her into the bathtub and making her stay there; then taking the victim to his sister Lani’s house; directing the victim go to a back bedroom; and then taking the victim, her 1-year-old daughter, and Lani to a gas station where the victim ultimately sought help.
The majority’s rebanee on State v. Jenkins, 257 Kan. 1074, 898 P.2d 1121 (1995), as a factually similar case is misplaced. In Jenkins, the defense lawyer’s conflict was his representation of the victim who was the primary witness against the lawyers efient. The facts here show that Beltran was present at Lani’s house when Jackson brought the victim to her house, after the attempted murder. The record is devoid of any factual suggestion or circumstance that would indicate Beltran had any material information about the crime—he was not a witness to any material element of the crime, and nothing in the record reflects Jackson told him anything about the crime or that Beltran ever made any statement to authorities. In no way is Beltran a key witness as was the case in Jenkins.
The record before us does not even show that Jacksons and Bel-trans interests were actually adverse. We know that Jackson did not think they were adverse because he told Gipson that he did not object to the representation of Beltran because Beltran “really was *148 not a witness to anything, not an issue.” The evidence in the record bears out Jackson’s statement.
The testimony at the preliminary hearing, combined with tire admissions by the defendant, demonstrate that Gipson obtained a highly favorable plea agreement for Jackson. The evidence shows the defendant voluntarily and knowingly entered his plea with full knowledge of the consequences. He testified he decided to take the plea because he was worried about the possible sentence he could receive based on the multiple original charges. The plea to a single amended charge significantly reduced defendants potential sentence. Jackson knew Gipson was representing Beltran, he knew that Beltran was listed as a witness for the State, and he did not object. The district court’s finding that there was no manifest injustice is supported by substantial competent evidence.
The effect of the majority opinion is to grant an automatic reversal in favor of Jackson solely because he did not have conflict-free counsel. Every conflict case creates a situation of “divided loyalties,” but not every case results in an automatic reversal. Under Mickens and Galaviz, when a defendant knows of a conflict and fails to object, the defendant must show the conflict had a significant actual effect on the adequacy of counsel’s representation. I would find Jackson has failed to make the required showing and affirm the district court’s denial of Jackson’s motion.